IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : : : : : | |
| | : | Civil Action No. 1:26-cv-3407 |
| Plaintiff, | : | |
| v. | : : | Complaint for Violations of the Federal Securities Laws |
| | : | |
| JON G. FULLENKAMP and SCOTT R. SAND, | : : | Jury Trial Demanded |
| | : | |
| Defendants. | : : : | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows against defendants Jon G. Fullenkamp ("Fullenkamp"), whose last known address is 13160 Teal Lane, Long Beach, WA 98631, and Scott R. Sand ("Sand"), whose last known address is 16639 Rocker Road, Rough and Ready, CA 95975 (collectively "Defendants"):

**SUMMARY**

1. This case involves a securities fraud scheme perpetrated by Defendants to misappropriate millions of dollars from two publicly traded, penny stock companies by causing them to fraudulently issue stock to a company secretly controlled by Fullenkamp.

2. Without publicly disclosing their roles, Fullenkamp and Sand effectively served as senior management for "Company 1" and "Company 2" (collectively the "Issuers").

3. From at least October 2020 through 2023, Defendants enriched themselves by causing the Issuers to enter into sham agreements with a third entity, "Vendor 1," which Fullenkamp secretly controlled.

4. Pursuant to these sham agreements, Defendants caused the Issuers to issue hundreds of thousands of shares of preferred stock to Vendor 1.

5.      Defendants sold some of the preferred shares to third parties, realizing $2.6 million, which they funneled through bank accounts of entities they controlled and split between them.

6.      By engaging in the conduct described in this Complaint, Fullenkamp and Sand violated, directly or indirectly, and unless enjoined will continue to violate, Section 17(a)(1) and (3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)(1) and (3)]; Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b), (d)] and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78u(d), (e)] to enjoin such acts, practices, and courses of business, additional injunctive relief as set forth in the Prayer for Relief, and to obtain disgorgement with prejudgment interest, and civil money penalties, and such other and further relief the Court may deem just and appropriate.

8.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), (d), and 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), (e), and 78aa].  Defendants, directly or indirectly, made use of the mails, or the means and instrumentalities of interstate commerce, or the facility of national security exchanges, in connection with the transactions, acts, practices, and courses of business alleged in this Complaint.

9.      Venue in this district is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because Defendants'

2

violations of the federal securities laws harmed hundreds of investors residing within the District of New Jersey.

## DEFENDANTS

10.     Jon G. Fullenkamp, age 71, served as an undisclosed, de facto officer of Company 1 and Company 2.  He also controlled Vendor 1, an entity he caused to be formed to perpetrate the scheme.  Previously, Fullenkamp served as a named officer of two publicly traded companies.

11.     Scott R. Sand, age 68, served as an undisclosed, de facto officer of Company 1 and Company 2.  Sand previously served as a registered representative.  Sand also previously served as the Chief Executive Officer ("CEO") of a penny stock issuer.  In 2010, in connection with a fraudulent kickback scheme involving the penny stock issuer for which Sand was CEO, Sand pled guilty to wire fraud, in violation of 18 U.S.C. §§ 1343, 1346, and served more than one year in prison.  In the Commission's parallel civil action relating to the kickback scheme, Sand and the Commission settled in 2011 and the district court entered a consent judgment imposing permanent officer and director and penny stock bars against Sand.

## RELEVANT ENTITIES AND INDIVIDUALS

12.     Company 1 is a Florida corporation organized in 2014 with its principal place of business in California.  It designed and manufactured custom equipment for brewers of craft beer.  Company 1 functionally ceased operations in 2024.  During at least the period October 2020 through 2023, Company 1's common stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], registered with the Commission, and traded on the Expert Market operated by OTC Market Groups through its subsidiary, OTC Link.

13.     Company 2 is a Florida company organized in 2021 with its principal place of business in California.  Company 2 shares many of the same officers and directors as Company 1.  From approximately its formation through 2023, Company 2's common stock was a "penny stock" as that term is defined in Section 3(a)(51) of the Exchange Act [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240.3a51-1], registered with the Commission, and traded on the Expert Market operated by OTC Market Groups through its subsidiary, OTC Link. In September 2024, Company 2 terminated its registration with the Commission.  Company 2 continues to operate a brewery.

14.     Vendor 1 is a privately held company formed in California in 2020, with its principal place of business in California.  The name of Vendor 1 derives from Individual 3, who was the purported CEO.  However, Fullenkamp exercised control over Vendor 1, including maintaining access to Vendor 1's bank accounts, phone number, and email address.

15.     Individual 1, age 52, is a resident of California.  Individual 1 was the founder and CEO of Company 1 and the CEO of Company 2.  Individual 1 is a welder with experience in the brewing industry.  At least during the period 2020 through 2023, Individual 1 lacked experience in corporate management, finance, and governance.

16.     Individual 2, age 46, resides in Maine.  Individual 2 is a personal trainer who provided personal training services to Fullenkamp from 2014 until approximately 2017. Defendants installed Individual 2 as a director of Company 1 and the nominal Chief Operating Officer of Company 2.

17.     Individual 3, age 56, is a personal trainer and massage therapist who purportedly served as CEO of Vendor 1.  Individual 3 resides in California.

4

**FACTS**

A.      **Background**

18.      In approximately 2018, Fullenkamp and Sand met through a mutual friend and began working together at a public company.

19.      In addition to being business associates, Fullenkamp and Sand became friends. Beginning in August 2022, Fullenkamp lived at Sand's house for two years.

B.      **Defendants Misappropriated and Sold Hundreds of Thousands of Shares of Company 1's Preferred Stock**

1.  **Defendants Caused Company 1 to Engage in a Reverse Merger and Become a Publicly Traded Company**

20.      In 2019, a mutual associate introduced Sand to Individual 1.  At the time, Company 1 was struggling financially.

21.      While Individual 1 had experience in welding and the manufacture of custom equipment for craft brewers, Individual 1 lacked experience in corporate management, governance, and finance.

22.      Sand presented himself as someone with experience in managing public companies and accessing public market funding.

23.      Within six months, Sand persuaded Individual 1 to take Company 1 public through a reverse merger with a public company Sand and Fullenkamp controlled ("Predecessor 1"), ostensibly to afford Company 1 access to public market funding.

24.      Due to his relationship with Fullenkamp, Individual 2 was a director of Predecessor 1.

25.     Although holding the title director, Individual 2 exercised no oversight of Predecessor 1.  Instead, Individual 2 served as a figurehead, signing corporate documents at Fullenkamp's direction.

26.     Upon closing of the reverse merger between Company 1 and Predecessor 1, in late 2019, Individual 2 continued as a director of Company 1.  Individual 1 served as Company 1's CEO and Chairman of the Board.

27.     Together Individuals 2 and 3 comprised a majority of Company 1's board of directors.

### 2.     Fullenkamp and Sand Exercised Extensive Control Over Company 1

28.     Although not formally identified as part of management of Company 1, Fullenkamp and Sand exercised extensive control over Company 1.  In addition to overseeing Company 1's reverse merger, Defendants managed Company 1's regulatory compliance, financial reporting, and investor relations.

29.     For example, on behalf of Company 1, Defendants drafted and reviewed public filings, press releases, and board resolutions; corresponded with FINRA; negotiated with creditors; orchestrated stock splits and new share issuances; created and disseminated investor presentations; accessed Company 1's bank accounts; and directed the issuance of preferred shares and convertible debt.  Defendants also directed Company 1 to issue new corporate securities.

30.     Individual 1 ceded control of these corporate functions to Defendants because he lacked experience managing a public company.  Individual 1 focused on the day-to-day operations of Company 2's brewery.

6

31.     Fullenkamp and Sand also exercised control of Company 1 through deceptive conduct.  Fullenkamp and Sand used technology to impersonate corporate officials of Company 1 and forge signatures necessary to take certain corporate actions.

32.     For example, Defendants used a Company 1 email address associated with Individual 1.  Using this email address, they regularly impersonated Individual 1 in communications with investor firms regarding funding and with transfer agents regarding the issuance of new securities.

33.     In addition, Sand used a Company 1 email address in Individual 2's name to link to an electronic signature service and forge Individual 2's name on numerous company documents, including an authorization to issue new Company 1 shares in connection with the securities fraud scheme alleged herein.

34.     Similarly, both Sand and Fullenkamp used the Company 1 email address in Individual 2's name to impersonate Individual 2 in emails with potential investors, lenders, and transfer agents.

35.     Defendants also directed Company 1's management through electronic group chats they established.

### 3.  Defendants Used Vendor 1 and Individual 3 to Further Their Scheme

36.     In 2020, after Company 1 had become a publicly traded company, Fullenkamp persuaded Individual 3, a personal trainer at a gym frequented by Fullenkamp, to go into business with him.

37.     In October 2020, Fullenkamp formed Vendor 1 using Individual 3's name.

38.     Fullenkamp told Individual 3 that Vendor 1 would be used to privately invest in companies at the direction of Defendants and using Defendants' money.

7

39.     Fullenkamp represented to Individual 3 that Individual 3's participation was necessary because cumulative stock ownership restrictions prevented Fullenkamp and Sand from purchasing the stock in their own names.

40.     In reality, Defendants used Individual 3 and Vendor 1 to perpetrate their fraudulent scheme.

41.     After forming Vendor 1, Fullenkamp directed Individual 3 to open a company bank account and provide Fullenkamp with access to the account.

42.     Fullenkamp established a website and email domain for Vendor 1 and created an email address using Individual 3's name.  However, Fullenkamp controlled the email account.

43.     Fullenkamp also created a new electronic signature account in Individual 3's name to give him the ability to forge Individual 3's signature on Vendor 1's corporate documents.

44.     In addition, Fullenkamp registered a cell phone in his wife's name, which he used to impersonate Individual 3 on phone calls.

45.     Though publicly described as the "manager" of Vendor 1, Individual 3 did almost nothing for Vendor 1.

**4.  Fullenkamp and Sand Used Their Control of Company 1 and Vendor 1 to Execute Their Securities Fraud Scheme and Enrich Themselves**

46.     Defendants used their control of Company 1 and Vendor 1 to execute their securities fraud scheme.

47.     In effectuating their scheme, Defendants impersonated officers and directors of Company 1 and Vendor 1, prepared fraudulent agreements, forged signatures, and caused Company 1 to file false Form 10-Ks.  They defrauded investors, other members of Company 1's management, Company 1, the transfer agent, brokerage firms, the third parties who purchased

8

the convertible preferred shares, and those who purchased the converted shares from the third parties

48.    On or about February 14, 2021, Defendants forged Individual 3's signature on a sham IP Purchase and License Agreement ("Sham Agreement") between Company 1 and Vendor 1, which Sand had prepared.

49.    The Sham Agreement provided that Vendor 1 would license unspecified—and nonexistent—intellectual property and technology to Company 1, launch an advertising campaign, establish distribution partnerships in Canada, South America, Europe, and Asia, and negotiate a sub-manufacturing contract with a specific, large, internationally known beer company.  In exchange, Company 1 agreed to pay a license fee of 500,000 shares of preferred stock, which were convertible to Company 1 common stock.  Fullenkamp and Sand knew, or were reckless in not knowing, that Vendor 1 would not be providing any services contemplated by the Sham Agreement.

50.    Defendants also forged the signature of Individual 2 on the Company 1 Board resolution confirming the Sham Agreement and authorizing the issuance of 500,000 shares of preferred stock to Vendor 1.

51.    Defendants concealed the fraudulent nature of the Sham Agreement from Company 1's management and shareholders.

52.    Company 1 senior management, including Individual 2 and Individual 1, did not know that Individual 3 was merely a figurehead at Vendor 1 and believed, based on the false information provided to them by Defendants, that Individual 3 and Vendor 1 would provide the contemplated services.

9

53.     Individual 3, whose work experience was limited to personal fitness training and massage therapy, had no contacts in the brewing industry, had no training or experience in marketing, and had never travelled internationally, or even owned a passport.

54.     Vendor 1 did not perform the contemplated services under the Sham Agreement. Nevertheless, Defendants sold approximately 400,000 preferred shares obtained via the Sham Agreement to third parties for approximately $2.6 million.

**5. In Connection with Selling the Preferred Shares to Third Parties, Defendants Backdated the Sham Agreement and Impersonated Officers of Company 1**

55.     To facilitate the sale of the preferred shares, Sand backdated the date of the Sham Agreement from approximately February 14, 2021 to October 15, 2020—six days before Vendor 1 even existed.  In so doing, Sand fraudulently shortened the mandatory six-month holding period to only two months.

56.     In April 2021, Fullenkamp and Sand sold approximately 400,000 convertible preferred shares to two third parties for approximately $2.6 million.

57.     The third parties converted the preferred shares to common stock and sold the shares on the open market.

58.     By backdating the Sham Agreement, Sand increased the value of the preferred shares to third parties because the shares could be converted and sold in April 2021, four months earlier than if the Sham Agreement had not been backdated.

59.     During the process of selling the preferred shares, Fullenkamp impersonated Individual 3 in emails with prospective buyers and with Company 1's transfer agent. Fullenkamp also forged Individual 3's signature on the share purchase agreements using the electronic signature account he had previously established.

60.    Through these transactions, Sand and Fullenkamp defrauded Company 1, the transfer agent, brokerage firms, and the third parties who purchased the convertible preferred shares, and injured Company 1, all of Company 1's existing shareholders, and those who purchased the converted shares from the third parties.

61.    Fullenkamp used his access to Vendor 1's bank accounts to transfer the vast majority of the proceeds of the sales to Sand and himself, moving the money through a series of bank accounts owned by entities controlled by Sand or himself.

62.    In March 2021, Fullenkamp and Sand caused Company 1 to deceive investors by filing a Form 10-K that they knew, or were reckless in not knowing, contained numerous false and misleading statements.  The Form 10-K falsely stated that the shares transferred to Vendor 1 were exchanged as part of a valuable agreement and misrepresented the execution date of the Sham Agreement.  The Form 10-K also omitted Fullenkamp's and Sand's key roles at Company 1, their personal interest in the Sham Agreement, and the fact that the shares were exchanged for no value or service, thus rendering statements in the filing, including those concerning the management of Company 1 and the value of the agreement, misleading.

### 6.  Defendants Concealed Their Fraud from Company 1's Management and Shareholders

63.    Fullenkamp and Sand knowingly, or recklessly, concealed their fraud from Company 1's management and shareholders.

64.    For example, in August 2021, to convince Company 1's management that Individual 3 was actually providing services under the Sham Agreement, Fullenkamp paid for Individual 3 to visit Company 1's facility and meet with members of Company 1's management.

65.    Prior to the meeting, Fullenkamp coached Individual 3 via text about how to appear knowledgeable about marketing and the craft beer industry.

66.     Subsequently, Company 1's management and employees encountered difficulties communicating with Individual 3 and further questioned whether Individual 3 was performing services under the Sham Agreement.

67.     In response, and in order to continue the fraud without detection, Fullenkamp, using the email address he created in Individual 3's name, impersonated Individual 3 via email in communications with Company 1 personnel.  Fullenkamp also impersonated Individual 3 via email and phone, using the cell phone he registered in his wife's name, in communications with media outlets.

### 7. Defendants Modified the Sham Agreement to Obtain Additional Preferred Shares

68.     In June 2022, Fullenkamp and Sand caused Company 1 to modify the Sham Agreement.  The modification provided that Vendor 1 would pay all outstanding, unpaid advertising costs and pay future advertising costs for a period of two years in exchange for an additional grant of 200,000 Company 1 convertible preferred shares.  ("Modified Sham Agreement").

69.     Although Company 1 transferred the preferred shares to Vendor 1 pursuant to the Modified Sham Agreement, Vendor 1 did not perform any services under the Modified Sham Agreement.

70.     At the time they orchestrated the deal, Defendants knew, or were reckless in not knowing, that Vendor 1 would not perform any services under the Modified Sham Agreement.

### C.     Defendants Repeated Their Scheme

71.     In approximately early 2021, with their plan to pilfer Company 1 underway, Defendants began to repeat their scheme with Company 2.

72.    At that time, Sand installed Individual 1 as the CEO and director of a second public company, the predecessor to Company 2 ("Predecessor 2").

73.    Fullenkamp and Sand caused Individual 2 to be appointed as director and Chief Operating Officer of Predecessor 2 by recommending him to Individual 1 for those positions. Again, Individual 1, who lacked experience in corporate management, relied on Fullenkamp and Sand regarding such matters.

74.    Several months later, at the direction of Fullenkamp and Sand, Company 2 completed a reverse merger with Predecessor 2, through which Company 2 became a public company.  Individual 2 and Individual 1 retained their management positions at Company 2.

75.    As with Company 1, Fullenkamp and Sand exercised control over Company 2, managing Company 2's regulatory compliance, financial reporting, and investor relations.

76.    For example, on behalf of Company 2, Fullenkamp and Sand drafted public filings, press releases, and board resolutions; prepared statements of operations and cash flows; orchestrated stock splits and new share issuances; accessed Company 2's bank accounts; and directed the issuance of preferred shares and convertible debt.

77.    Fullenkamp and Sand also exercised control of Company 2 through deceptive conduct.  Fullenkamp and Sand used technology to impersonate corporate officials of Company 2 and forge signatures necessary to take certain corporate actions.

78.    In late 2021, Fullenkamp and Sand caused Company 2 and Vendor 1 to enter into a sham IP and Purchase License Agreement ("Second Sham Agreement"), which Sand drafted.

79.    Similar to the original Sham Agreement between Company 1 and Vendor 1, the Second Sham Agreement entitled Vendor 1 to shares of preferred stock of Company 2 in

13

exchange for providing intellectual property and licensing rights and a marketing and advertising campaign.

80.     As with the original Sham Agreement, Fullenkamp and Sand knew, or were reckless in not knowing that Individual 3 and Vendor 1 possessed no intellectual property and had never provided marketing services.  They also knew, or were reckless in not knowing, that Vendor 1 would provide no intellectual property or services to Company 2 as required by the Second Sham Agreement.

81.     And, as with the original Sham Agreement, Fullenkamp forged Individual 3's signature on the Second Sham Agreement.

82.     Fullenkamp and Sand concealed the fraudulent nature of the Second Sham Agreement from Company 2's management and shareholders.

83.     In February 2022, while impersonating Individual 2 via email, Sand caused false information to be provided to Company 2's auditor regarding the work and purported intellectual property of Vendor 1 and Individual 3, when he falsely described Vendor 1 as a "boutique marketing and advertising firm" that "uses its own proprietary (IP) software and database for marketing [sic] craft beer customers."  Sand knew, or was reckless in not knowing, that this information was false.

84.     In April 2022, Fullenkamp and Sand caused Company 2 to deceive investors by filing a Form 10-K that they knew, or were reckless in not knowing, contained numerous false and misleading statements.  The Form 10-K falsely stated that the shares transferred to Vendor 1 were issued in exchange for "the marketing of products and services into the European Community based on the inventions of the IP/License Rights to develop and commercialize for the sole benefit" of Company 2.  Sand and Fullenkamp omitted from the Form 10-K discussion

of their roles at Company 2 and their personal interest in the arrangement, thus rendering statements in the filing, including those concerning the management of the issuer and the value of the agreement, misleading.

85.    Fullenkamp impersonated Individual 3 in various communications with media outlets and Company 2 employees relating to advertising for Company 2.

86.    Company 2 transferred the preferred shares to Vendor 1.  In early 2023, Fullenkamp and Sand attempted to profit from the sale of the convertible preferred shares of Company 2.

**D.    Company 1's Business Fails and Company 2 Deregisters Its Securities**

87.    In 2023, Company 1 largely ceased operations, lacking sufficient funds to pay payroll and creditors.  The value of Company 1's common shares of stock have plummeted to near zero.  Defendants' scheme contributed to Company 1's failure.

88.    In September 2024, Company 2 filed a form to terminate the Exchange Act registration of its securities with the Commission.

**E.    Defendants Violated the Federal Securities Laws**

89.    During the relevant period, Defendants perpetrated a fraudulent scheme.

90.    In perpetrating the fraudulent scheme, Defendants used the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange, including by communicating false statements and sending fabricated documents through emails.

91.    Defendants engaged in deceptive conduct, including, but not limited to, impersonating officers and directors of the Issuers, preparing fraudulent agreements, forging signatures, lying to regulators, and causing the issuers to file false Form 10-Ks.

92. Defendants acted knowingly and/or recklessly while engaging in deceptive conduct.

93. Through this scheme, Defendants employed a device, scheme or artifice to defraud and engaged in acts, transactions or courses of business that operated as a fraud or deceit upon investors, prospective investors, and others.

94. The conduct described herein was in connection with the purchase, sale, or offering of securities.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF**
**Violations of Sections 17(a)(1) and 17(a)(3) of the Securities Act**
**(Defendants Fullenkamp and Sand)**

95. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 94, inclusive, as if they were fully set forth herein.

96. By engaging in the conduct alleged herein, Fullenkamp and Sand, directly or indirectly, singly or in concert, by the use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, (1) knowingly or recklessly employed devices, schemes or artifices to defraud; and/or (2) knowingly, recklessly, or negligently engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

97. By reason of the foregoing, Fullenkamp and Sand violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and**
**Rules 10b-5(a) and 10b-5(c) thereunder**
**(Defendants Fullenkamp and Sand)**

98.     The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 94, inclusive, as if the same were fully set forth herein.

99.     By engaging in the conduct alleged herein, Fullenkamp and Sand directly or indirectly, by use of the means or instruments of interstate commerce or of the mails, or the facility of a national securities exchange, in connection with the purchase and sale of securities described herein, knowingly or recklessly: (a) employed devices, schemes, or artifices to defraud; and/or (b) engaged in acts, practices, and courses of business which operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

100.    By reason of the foregoing, Fullenkamp and Sand, directly and indirectly, violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rules 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Fullenkamp and Sand from, directly or indirectly, violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] by committing or engaging in specified actions or activities relevant to such violations.

### II.

Ordering Defendants Fullenkamp and Sand to disgorge all ill-gotten gains or unjust enrichment with prejudgment interest to effect the remedial purposes of the federal securities laws.

### III.

Ordering Defendants Fullenkamp and Sand to pay civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### IV.

Ordering that Defendant Fullenkamp is barred from serving as an officer or director of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**V.**

Ordering that Defendant Fullenkamp is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a51-1].

**VI.**

Ordering that Defendant Fullenkamp surrender for cancellation all rights to all shares of preferred and common stock of the Issuers acquired in connection with the Sham Agreement, Modified Sham Agreement, and Second Sham Agreement.

**VII.**

Ordering that Defendant Sand is enjoined from directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security; provided, however, that such injunction shall not prevent him from purchasing or selling securities for his own personal account.

**VIII.**

Granting such other and further relief as this Court may determine to be just and necessary.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Respectfully submitted,

By: s/John V. Donnelly III
John V. Donnelly III
Gregory Bockin
Securities and Exchange Commission
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
Email:  DonnellyJ@sec.gov

**ATTORNEYS FOR PLAINTIFF
SECURITIES AND EXCHANGE
COMMISSION**

Dated: March 31, 2026

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Case No. 1:26-cv-3407** |
| **Plaintiff,** | **DESIGNATION OF AGENT FOR SERVICE** |
| v. | |
| **JON G. FULLENKAMP and SCOTT R. SAND,** | |
| **Defendants.** | |

Pursuant to Local Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the captioned action. Therefore, service upon the United States or its authorized designee, David Dauenheimer, Deputy Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, 7th Floor, Newark, NJ 07102 shall constitute service upon the Commission for purposes of this action.

Respectfully submitted,

s/ John V. Donnelly III
John V. Donnelly III
Securities and Exchange Commission
1617 JFK Blvd., Suite 520
Philadelphia, PA 19103
Telephone: (215) 597-3100
Facsimile: (215) 597-2740
Email:  DonnellyJ@sec.gov

**ATTORNEY FOR PLAINTIFF**
**SECURITIES AND EXCHANGE**
**COMMISSION**

21